IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., et al.,

                Plaintiffs,

v.                                CIVIL ACTION NO.  2:12-3412
                                (Consolidated with 2:13-6870)

ALEX ENERGY, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are seven motions for partial summary judgment: Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties against Jacks Branch Coal Company (ECF No. 83); Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties against Bandmill Coal Corporation (ECF No. 85); Defendants' motion for partial summary judgment (ECF No. 87);[1] Bandmill's motion for partial summary judgment (ECF No. 89); Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties against Aracoma Coal Company, Inc., Highland Mining Company, Independence Coal Company, Inc., and Kanawha Energy Company (ECF No. 91); Highland's motion for partial summary judgment (ECF No. 93); and Jacks Branch's motion for partial summary judgment (ECF No. 95). Also

---

[1] This motion is brought by Defendants Aracoma Coal Company, Inc., Bandmill Coal Corporation, Highland Mining Company, Independence Coal Company, Inc., Jacks Branch Coal Company, and Kanawha Energy Company. Alex Energy, Inc., is the only Defendant who does not join in this motion. When discussing this motion in the Memorandum Opinion and Order, it should be understood that the Court is referring to all Defendants other than Alex Energy.

1

pending are Plaintiffs' Rule 37(c) motion to strike Exhibit 1 of Highland's reply brief in support of its motion for partial summary judgment (ECF No. 119) and Jacks Branch's motion for a partial stay pending entry of a consent decree (ECF No. 133).

For the reasons explained in this Memorandum Opinion and Order, the Court rules as follows:

1.  The Court **FINDS** that the holders of permits which do not have selenium limits or monitoring and reporting requirements on their face must comply with West Virginia water quality standards, consistent with this Court's findings in *Ohio Valley Environmental Coalition, Inc. ["OVEC"] v. Elk Run Coal Company, Inc.*, No. 3:12-cv-0785, 2014 WL 29562 (S.D. W. Va. Jan. 3, 2014), *OVEC v. Fola Coal Company, LLC*, No. 2:12-cv-3750, 2013 WL 6709957 (S.D. W. Va. Dec. 19, 2013), and *OVEC v. Marfork Coal Company, Inc.*, No. 5:12-cv-1464, 2013 WL 4506175 (S.D. W. Va. Aug. 22, 2013).

2.  The Court **FINDS** that the West Virginia Department of Environmental Protection ("WVDEP") is not authorized to indefinitely suspend the requirement that permit holders comply with water quality standards. Therefore, the holders of permits which impose monitoring and reporting requirements for selenium but do not include future selenium limits explicitly on the face of the permits must comply with water quality standards.

3.  The Court **FINDS** that the WVDEP is authorized to temporarily suspend the requirement that permit holders comply with water quality standards. Therefore, the holders of permits which impose present monitoring and reporting requirements for

selenium and selenium limits that go into effect at a later date are not required to comply with water quality standards in the interim period between issuance of their permits and the effective date of the selenium limits.

4.      The Court accordingly **GRANTS in part** and **DENIES in part** Defendants' motion for partial summary judgment (ECF No. 87), consistent with the above findings.

5.      The Court **FINDS** that Bandmill's discharges are covered by its WV/NPDES Permit WV1015559 but also **FINDS** that Bandmill is liable for selenium violations at Outfall 001 of that permit. In accordance with these findings, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties against Bandmill (ECF No. 85). Specifically, the Court **GRANTS** the motion as to liability regarding Outfall 001 of this permit but **DENIES as premature** Plaintiffs' claims regarding the number of violations and for injunctive relief, declaratory relief, and civil penalties. The Court **DENIES** Plaintiffs' motion to the extent it asks this Court to find that Bandmill's discharges were made without a permit. The Court also **GRANTS in part** and **DENIES in part** Bandmill's motion for partial summary judgment (ECF No. 89).

6.      The Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties against Aracoma, Highland, Independence, and Kanawha Energy (ECF No. 91). Specifically, the Court **GRANTS** the motion as to liability regarding: Outfalls 001 and 002 of Aracoma's WV/NPDES Permit WV1010689; Outfall 004 of Independence's WV/NPDES Permit 1016890; and Outfall 007 of Kanawha Energy's

WV/NPDES Permit WV1015176. However, Plaintiffs' motion is **DENIED** regarding Outfalls 001 and 019 of Highland's WV/NPDES Permit WV1016938. The Court **DENIES as premature** Plaintiffs' claims regarding the number of violations and for injunctive relief, declaratory relief, and civil penalties. The Court **DENIES** Highland's motion for partial summary judgment (ECF No. 93) and **DENIES as moot** Plaintiffs' Rule 37(c) motion to strike Exhibit 1 of Highland's reply brief in support of its motion for partial summary judgment (ECF No. 119).

7. The Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for partial summary judgment and for declaratory and injunctive relief and civil penalties against Jacks Branch (ECF No. 83). Specifically, the Court **GRANTS** the motion as to liability regarding Outfalls 004, 014, and 015 of Jacks Branch's WV/NPDES Permit WV0093929 and Outfalls 002, 009, 011, and 014 of Jacks Branch's WV/NPDES Permit WV1012452. The Court **DENIES as premature** Plaintiffs' claims regarding the number of violations and for injunctive relief, declaratory relief, and civil penalties. The Court **GRANTS** Jacks Branch's motion for partial summary judgment as to Outfall 015 of Jacks Branch's WV/NPDES Permit WV1012452 (ECF No. 95). Also, the Court **holds in ABEYANCE** Jacks Branch's motion for a partial stay pending entry of a consent decree (ECF No. 133).

8. The Court **DIRECTS** the parties to file a report regarding the status of the remaining claims, plans for disposition of those claims, and plans for phase II of this litigation within **twenty-one (21) days** of the entry of this Memorandum Opinion and Order.

## I.    Background

4

Plaintiffs OVEC, West Virginia Highlands Conservancy, Inc., and Sierra Club filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. They allege that Defendants violated these statutes by discharging excessive amounts of selenium into the waters of West Virginia. This case implicates nine WV/NPDES permits. Each permit is held by one of the seven Defendants: Alex Energy; Aracoma; Bandmill; Highland; Independence; Jacks Branch; and Kanawha Energy. Only some of the outfalls[2] covered by these permits are the subject of the pending motions for partial summary judgment.[3]

In Section II, the Court explains the legal standard applicable to motions for summary judgment. After discussing the relevant regulatory framework in Section III, the Court will summarize in Section IV the categories of permits involved in this case and determine the selenium requirements applicable to each permit. In Section V, the Court will analyze whether summary judgment should be granted as to each individual permit.

## II.    Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue

---

[2] "Outfalls" and "outlets" are used interchangeably by the parties. Thus, this Memorandum Opinion and Order will do so as well.

[3] The following two permits are not the subject of any pending motion for partial summary judgment: Alex Energy's WV/NPDES Permit WV1008277 (for which violations are alleged in the Complaint regarding Outfalls 001 and 003), and Jacks Branch's WV/NPDES Permit WV0097217 (for which violations are alleged in the Complaint regarding Outfall 005). Additionally, the following individual outfalls are not the subject of any pending motion for partial summary judgment: Outfalls 005 and 044 of Aracoma's WV/NPDES Permit WV1010689; Outfall 020 of Highland's WV/NPDES Permit WV1016938; and Outfall 012 of Jacks Branch's WV/NPDES Permit WV1012452.

as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Having discussed the standard for review of motions for summary

judgment, the Court now turns to the regulatory framework underlying this lawsuit.

### III.    Regulatory Framework

One primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the CWA prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program pursuant to 33 U.S.C. § 1342(b). West Virginia received such approval of its state-run NPDES program in 1982. 47 Fed. Reg. 22363-01 (May 24, 1982). The State's NPDES program is currently administered by the WVDEP.

All West Virginia NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states in part that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]."[4] States are required by the CWA to adopt water

---

[4] Section 47-30-5.1.f states in its entirety: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2. Further, any activities covered under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein. However, as provided by subdivision 3.4.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Sections 301, 302, 306, 307, 318, 403, and 405 and Article 11."

quality standards in order to "protect the public health or welfare, [and] enhance the quality of water," and such water quality standards "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A). Each standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *Id.*

West Virginia's water quality standards promulgated for the protection of aquatic life impose limitations on selenium. Specifically, selenium cannot exceed an acute limitation of 20 ug/l or a chronic limitation of 5 ug/l. W. Va. Code R. § 47-2, app. E, tbl.2, div. 8.27. The acute limitation is defined as a "[o]ne hour average concentration not to be exceeded more than once every three years on the average." *Id.* § 47-2-9 n.1. The chronic limitation is a "[f]our-day average concentration not to be exceeded more than once every three years on the average." *Id.* n.2.

In *OVEC v. Fola Coal Company, LLC*, this Court was asked to determine whether holders of WV/NPDES permits that incorporate § 47-30-5.1.f by reference are required to comply with the selenium limitations found in West Virginia's water quality standards. No. 2:12-cv-3750, 2013 WL 6709957, at *10-21 (S.D. W. Va. Dec. 19, 2013). The Court examined two permits held by Fola, neither of which identified selenium as a pollutant whose presence must be monitored or limited. Both permits, however, incorporated by reference the WV/NPDES Rules for Coal Mining and Facilities found in Title 47, Series 30, of the West Virginia Code, including

§ 47-30-5.1.f. This incorporation by reference was in accordance with state rules, which require that the water quality standards rule of § 47-30-5.1.f—among other rules—"be incorporated into the WV/NPDES permits either expressly or by reference." W. Va. Code R. § 47-30-5; *id.* at *2. Relying in part on this Court's earlier decision in *OVEC v. Marfork Coal Company, Inc.*, No. 5:12-cv-1464, 2013 WL 4506175 (S.D. W. Va. Aug. 22, 2013), this Court held that § 47-30-5.1.f was an explicit and enforceable condition of Fola's WV/NPDES permits and that Fola would not be protected by the permit shield defense[5] if it violated this permit condition. *Fola*, 2013 WL 6709957, at *10-21; s*ee also OVEC v. Elk Run Coal Company, Inc.*, No. 3:12-cv-0785, 2014 WL 29562, at *3-10 (S.D. W. Va. Jan. 3, 2014) (relying in part on this Court's discussion of § 47-30-5.1.f in *Marfork* and *Fola*).

In addition to being subject to the CWA, coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program pursuant to 30 U.S.C. § 1253. West Virginia received conditional approval of its state-run program in 1981. 46 Fed. Reg. 5915-01 (Jan. 21, 1981). West Virginia's surface mining permit program is administered by the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code § 22-3-1 et seq. Regulations passed pursuant to the WVSCMRA require permit holders to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these

---

[5] Under the permit shield defense, a permit holder cannot be held liable for CWA violations if the permit holder is in compliance with the terms of its permit. *See* 33 U.S.C. § 1342(k).

performance standards requires that "[d]ischarge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

### IV.    Permit Categories and the Selenium Requirements Applicable to Each Category

#### A.  *Summary of Permit Categories*

In their shared motion for partial summary judgment, Defendants (except Alex Energy) move for summary judgment as to all of Plaintiffs' claims, arguing that Defendants are shielded from liability because they are not required to comply with water quality standards, and because, therefore, their discharges comply with all permit terms. Defs.' Mot. Summ. J., ECF No. 87; Defs.' Mem. Supp. Mot. Summ. J., ECF No. 99. The Court need not reiterate its discussion of the permit shield defense or the applicability of water quality standards to the extent such issues were resolved in *Fola*, *Marfork*, and *Elk Run*. Instead, the Court will focus exclusively on the novel issues raised in the instant case. All of the permits in this case incorporate § 47-30-5.1.f by reference in the manner described above. The permits differ, however, in their references to selenium on the face of the permits.[6] Before the Court can assess whether Defendants are liable for violations of their permits, the Court must determine the selenium requirements applicable to

---

[6] That is, the text of the permits differ in whether and to what extent they explicitly identify selenium, as compared to solely incorporating by reference the water quality standards provision of § 47-30-5.1.f.

each permit. For the purposes of determining the applicable selenium requirements, it is helpful to sort the permits into four categories.

1. *Permits with Present Selenium Limits on the Face of the Permits*

Certain permits in this case include selenium limits which are currently in effect. These permits impose selenium discharge limits of 4.7 ug/l as a monthly average and 8.2 ug/l as a daily maximum. The parties do not dispute that liability for violations of these permits hinges solely on whether these limits have been exceeded. The following permits fall into this category: Jacks Branch's WV/NPDES Permit WV0093929 and Jacks Branch's WV/NPDES Permit WV1012452.

2. *Permits with Present Monitoring and Reporting Requirements and Future Selenium Limits*

Permits in this group have both numeric selenium effluent limits that go into effect on a future specific date and present selenium monitoring and reporting requirements. The following permits fall into this category: Bandmill's WV/NPDES Permit WV1015559 (which has selenium limits that go into effect on February 1, 2016) and Highland's WV/NPDES Permit WV1016938 (which has selenium limits that go into effect on December 7, 2015, per the terms of its compliance schedule).

3. *Permits with Monitoring and Reporting Requirements but No Later Selenium Limits*

These permits have present selenium monitoring and reporting requirements on the face of the permit. They do not, however, have express selenium limits on the face of the permit or numeric effluent limits that go into effect on a later date. The following permits fall into this

category: Jacks Branch's WV/NPDES Permit WV0097217; Independence's WV/NPDES Permit WV1016890; and Kanawha Energy's WV/NPDES Permit WV1015176.

### 4.   *Presents Which Do Not Expressly Mention Selenium*

The following permits contain no express limits on selenium discharges and no express selenium reporting and monitoring requirements: Aracoma's WV/NPDES Permit WV1010689 and Alex Energy's WV/NPDES Permit WV 1008277.[7] Aracoma's permit addresses selenium no differently than the permits at issue in *Elk Run* and *Fola*. In those cases, this Court held that § 47-30-5.1.f was an explicit and enforceable permit condition and that the defendants would not be protected by the permit shield defense if they violated that permit condition. *Elk Run*, 2014 WL 29562, at *10; *Fola*, 2013 WL 6709957, at *11. Defendants here have not added any argument on this issue beyond that already explored in *Fola* and *Elk Run*. The Court **FINDS** that *Fola* and *Elk Run* control the analysis of Aracoma's permit and that, therefore, the water quality standards provision is an explicit and enforceable condition of Aracoma's permit.

Having discussed what selenium requirements apply to the first and last permit categories, the Court now turns to the more challenging task of determining the selenium requirements applicable to the other two categories of permits.

### B. *Examination of Permits with Present Monitoring and Reporting Requirements and Future Selenium Limits on Their Face*

Defendants argue that, when operating under permits which contain future selenium limits and present monitoring and reporting requirements, they are not required to comply with the selenium limits set in West Virginia's water quality standards. They point out that the portion

---

[7] Alex Energy's permit, however, is not the subject of any motion for partial summary judgment, and so further discussion of this permit is unnecessary.

of the permit that would otherwise list selenium limits instead reads "report only," *see, e.g.*, Bandmill's WV/NPDES Permit WV1015559 at 2, ECF No. 87-1, and argue that the inclusion of selenium monitoring and reporting requirements in this manner trumps the more general part of the permit which incorporates by reference the water quality standards. Defendants additionally point out that the selenium limits which go into effect in the future—a monthly average of 4.7 ug/l and a daily maximum of 8.2 ug/l—are *stricter* than the limits mandated by the water quality standards. Based on this, they argue, compliance with these stricter limits in the future will mean compliance with water quality standards. In assessing the parties' arguments on this issue, the Court must first consider whether the WVDEP has the legal authority to suspend the requirement that a permit holder comply with water quality standards. Second, having determined the scope of the WVDEP's power, the Court will determine what effect the permit language has on Defendants' requirements.

State law requires that § 47-30-5.1.f be incorporated into all permits. W. Va. Code R. § 47-30-5 ("The following conditions apply to all WV/NPDES permits. All conditions shall be incorporated into the WV/NPDES permits either expressly or by reference."). However,

> Nothing in subsection 5.1[ ] of this rule shall be construed to limit or prohibit any other authority the Secretary may have under Article 3 or Article 11 of Chapter 22 [of] the West Virginia Code or to relieve the permittee from any responsibilities, liabilities or penalties for not complying with 47 C.S.R. 2 and 47 C.S.R. 11.

W. Va. Code R. § 47-30-5.1.g.[8] Article 11 of Chapter 22 states, in pertinent part,

> All persons affected by rules establishing water quality standards and effluent limitations shall promptly comply therewith: *Provided,* That: (1) Where necessary and proper, the secretary may specify a reasonable time for persons not complying with such standards and limitations to comply therewith . . . .

---

[8] "Secretary" refers to "the Secretary of the [WVDEP] and his or her authorized agent." W. Va. Code R. § 47-30-2.43.

W. Va. Code § 22-11-6 (emphasis in original). These provisions together indicate that the WVDEP may exercise its power to *temporarily* exempt a permit holder from the requirement to comply with water quality standards, but that it cannot *indefinitely* or *permanently* exempt a permit holder from this requirement. This interpretation makes practical sense—it recognizes that some permit holders may need extra flexibility as they attempt, in good faith, to achieve water quality standards but that eventually all permit holders should be held to the same baseline standard.

The WVDEP's ability to temporarily suspend the requirement that a permit holder comply with water quality standards accords not only with state law but with federal law as well. As explained earlier, West Virginia has a state-run NPDES program, approved by the EPA and administered by the WVDEP. The water quality standards at issue here are not federally-imposed but instead were passed pursuant to state authority granted under federal law. Because the state authority created the water quality standards, it makes sense that the state may also suspend compliance therewith, within state-prescribed limits. The state-prescribed limitation here is that the WVDEP may specify a "reasonable time" for persons not complying with those standards to come into compliance. In other words, the water quality standards under state law expressly contemplate the possibility that the WVDEP may temporarily suspend their applicability for a given permit holder. Therefore, the imposition of that "reasonable time" to come into compliance does not violate the CWA.

Having determined that the WVDEP has the authority to temporarily suspend the requirement that a permit holder comply with water quality standards, the Court next turns to whether the WVDEP did in fact do so in the permits at issue. The Court will consider whether

14

there are any conflicts among or ambiguity within the permit provisions. Monitoring and reporting requirements cannot, on their own, conflict with selenium limits because such requirements are not effluent limits:

> The term 'effluent limitation' means any *restriction* established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

33 U.S.C. § 1362(11) (emphasis added). Monitoring and reporting requirements are not *restrictions* on selenium and, therefore, do not meet this definition. To support their argument to the contrary, Defendants point to 33 U.S.C. § 1365(f). That provision states, in pertinent part, that:

> *For purposes of this section*, the term "effluent standard or limitation under this chapter" means . . . (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title) . . . .

33 U.S.C. § 1365(f) (emphasis added). According to its terms, this definition applies only for the purposes of Section 1365, which deals with citizen suits, meaning that a citizen can sue to enforce a monitoring and reporting requirement found in a permit. This provision does not mean, however, that monitoring and reporting requirements are effluent limits for general CWA purposes.

Although monitoring and reporting requirements are not "effluent limits," the Court nonetheless finds that the wording of this category of permits—with their present monitoring and reporting requirements coupled with future selenium limits—is ambiguous overall. Plaintiffs suggest that there is no ambiguity because being required to follow water quality standards now does not prevent Highland and Bandmill from following the more stringent selenium limits set

out for the future. However, the future effective date for selenium compliance creates an ambiguity—it could mean that Highland and Bandmill must comply with water quality standards in the interim or it could mean that Highland and Bandmill need not comply now as long as they meet the future limits.

When the WVDEP reissued Highland's permit with a compliance schedule, the WVDEP had determined that Highland's outlets emitted selenium in concentrations that violated water quality standards. WV/NPDES Permit WV1016938 at 48, ECF No. 87-2. The reissued permit contained a compliance schedule in order to allow time for Highland to come into compliance with selenium limits. It is this overall context—delayed effluent limits outlined in the permit coupled with water quality standards (which include selenium limits) incorporated by reference into the permit—that creates ambiguity. Because the permit is ambiguous, the Court will look outside the terms of the permit for guidance on how the permit should be interpreted. *See Poling v. Pre-Paid Legal Servs., Inc.*, 575 S.E.2d 199, 207 (2002) (noting that parole evidence is admissible when contract is ambiguous). The Court can, therefore, consider the Rationale Page that accompanies Highland's permit. WV/NPDES Permit WV1016938 at 48-50. The Rationale Page states, in pertinent part, as follows:

> In the past, Selenium was included on this permit as report only. New findings indicate that; [sic] based on DMR[9] reports for this permit, it is noted that Rp[10] exist for this parameter on outlets 001 and 019. This data indicated that outlets 001 and 019 regularly exhibit selenium concentrations greater than the water quality standard of 5 ug/l. The company is being issued a compliance schedule for outlets 001 and 019; [sic] to allow time to come into compliance for this parameter.

---

[9] "DMR" refers to "discharge monitoring report" (footnote not in original).

[10] "Rp" refers to the "reasonable potential" of a given pollutant causing violations of an applicable limit (footnote not in original).

16

*Id.* at 48.[11] This shows that the WVDEP, in reissuing the permit together with a compliance schedule, intended to exempt Highland from the requirement to comply with selenium limits until December 7, 2015, when a monthly average of 4.7 ug/l and a daily maximum of 8.2 ug/l go into effect, except as specific milestones within the compliance schedule may require otherwise. West Virginia law provides the WVDEP with the authority to temporarily suspend the requirement that a permit holder comply with selenium water quality standard limits in this manner and for this reason. If Highland abides by that schedule, then Highland is being given "a reasonable time" to comply with the selenium limits set in its reissued permit, and it will not be in violation of state law. The Rationale Page clears up the permit's ambiguity. The Court finds that Highland is, therefore, temporarily exempted from the requirement to comply with selenium limits, in line with the compliance schedule included in the reissued permit. Highland is not required to comply with the selenium limits set by the water quality standards in the interim period after the re-issuance of the permit and before the stricter selenium limits go into effect in the future.

Bandmill's permit is also ambiguous, and so the Court will look to the Rationale Page accompanying this permit as well. WV/NPDES Permit WV1015559 at 14-15, ECF No. 87-1. The Rationale Page states, "Monitor and report only requirements for selenium are hereby imposed at outlet[] 001 . . . for a period of 27 months following the effective date (November 1, 2013)." *Id.* at 14. Additionally, "[b]eginning with the 28th month following the effective date

---

[11] Defendants explain that the omission of Outfall 020 from the Rationale Page was "a mere oversight, as Outlet 020 is clearly subject to the compliance schedule in other parts of the permit." Defs.' Mem. Supp. Mot. Summ. J. 12 n.12.

hereof, selenium limits of 4.7 ug/l (monthly average) and 8.2 ug/l (daily maximum) shall take effect at outlet 001 . . . ." *Id.* Although Bandmill's Rationale Page does not include the same level of explanation as Highland's and does not make an explicit finding that selenium has been a problem for Bandmill, it nonetheless demonstrates that the WVDEP intended to temporarily delay the effective date of Bandmill's otherwise-required compliance with selenium limits. Therefore, Bandmill is not required to comply with the selenium limits set by the water quality standards in the interim period after the issuance of the permit and before the stricter selenium limits go into effect in the future.

### C. Examination of Permits with Monitoring and Reporting Requirements but No Later Selenium Limits on Their Face

Although the state rules contemplate that the WVDEP may temporarily suspend the requirement that a permit holder comply with water quality standards, those rules do not suggest that the WVDEP may indefinitely or permanently do so. *See* W. Va. Code § 22-11-6(1) ("Where necessary and proper, the secretary may specify a reasonable time for persons not complying with such standards and limitations to comply therewith . . . ."). Therefore, it would be impermissible for the WVDEP to impose only monitoring and reporting requirements for selenium—but no selenium limits—for the entire duration of a permit, thereby exempting the permit holder from complying with the permit condition incorporating water quality standards. Furthermore, because monitoring and reporting requirements are not themselves effluent limits, for the reasons explained above, the monitoring and reporting requirements do not conflict with the inclusion by reference of § 47-30-5.1.f. Both apply; therefore, the holders of such permits must comply with the selenium limits imposed by West Virginia's water quality standards.

18

This finding does not conflict with the Court's finding above regarding the Bandmill and Highland permits. For those two permits, the WVDEP exercised its authority under West Virginia law to temporarily suspend the requirement that permit holders comply with selenium limits. This Court's recognition of the WVDEP's power to temporarily suspend compliance does not mandate a similar finding with regard to an indefinite suspension of selenium limits. Indeed, such a finding would violate West Virginia law. Therefore, the holders of permits which do not contain future selenium limits must comply with the selenium water quality standards promulgated by West Virginia.

For the reasons explained above, the Court **GRANTS in part** and **DENIES in part** Defendants' shared motion for partial summary judgment. Having decided what selenium limits apply to each permit, the Court now turns to whether summary judgment is warranted regarding any of the permits in this case.

## V.     Summary Judgment as to Each Permit[12]

### A.  *Aracoma's WV/NPDES Permit WV1010689*

Aracoma's WV/NPDES Permit WV1010689 incorporates by reference the requirement found in West Virginia Code of State Rules § 47-30-5.1.f that discharges shall not violate applicable water quality standards. The Complaint alleges selenium violations at sixteen outfalls covered by this permit. Compl. ¶ 80, ECF No. 1. Pursuant to a subsequent stipulation, Plaintiffs are no longer pursuing claims related to many of those outfalls. Stipulation, ECF No. 33. As a result, the only remaining claims under this permit relate to Outfalls 001, 002, 005, and 044. *Id.* Plaintiffs move for partial summary judgment in their favor as to liability regarding Outfalls 001

---

[12] This section only discusses permits and outfalls for which at least one of the parties has moved for partial summary judgment.

and 002. Pls.' Mot. Summ. J., ECF No. 91; Pls.' Mem. Supp. Mot. Summ. J. 21-23, ECF No.

100.

In deciding whether summary judgment should be granted as to liability, first the Court

will determine whether the standing requirements have been satisfied. Next, the Court will

examine whether the sixty days' notice requirement is met. Then the Court will consider whether

the Complaint contains a good-faith allegation of continuous or intermittent violation. Lastly, the

Court will determine if Plaintiffs have proven selenium violations sufficient to establish liability.

The Court will follow this same pattern—with minor modification—when analyzing subsequent

permits in this Memorandum Opinion and Order.

    *1.  Legal Standing*

In order to bring any action in federal court, a plaintiff must have standing—that is, a

plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to

make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston*

*Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S.

Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to

satisfy the minimum constitutional requirements for standing, an individual plaintiff must

demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b)
> actual or imminent, not conjectural or hypothetical; (2) the injury is fairly
> traceable to the challenged action of the defendant; and (3) it is likely, as opposed
> to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In environmental cases, "a

plaintiff need only show that he used the affected area, and that he is an individual 'for whom the

aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d 868, 882 (S.D. W. Va. 2011) (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). Plaintiffs "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Outfall 001 discharges into Camp Branch of Dingess Run of the Guyandotte River. Outfall 002 discharges into one or more unnamed tributaries of Dingess Run. Plaintiffs allege legal standing as to Outfalls 001 and 002 through Kenneth King and Cindy Rank. *See* Kenneth King Decl., ECF No. 91-22; Cindy Rank Decl., ECF No. 91-23; Kenneth King Dep., ECF No. 91-28; Cindy Rank Dep., ECF No. 91-29. Mr. King is a member of OVEC and Sierra Club, but not the West Virginia Highlands Conservancy. King Dep. 9-10. He used to seine for minnows in Dingess Run, but he no longer does so because the minnow population has dropped. King Decl. ¶ 7. He believes this drop is attributable to selenium in the water. *Id.* Mr. King states that he recreationally "visited the Camp Branch drainage and the unnamed tributary affected by Aracoma's operations on Camp Branch approximately 50 times in [his] life," but his "visits to those drainages stopped once mining began." *Id.* ¶ 9. Mr. King asserts he is concerned about selenium pollution in these areas and that he "would return to those watersheds again if permitted to do so." *Id.* ¶ 10. He lives on Dingess Run just a few miles downstream from where Camp Branch enters Dingess Run, and his knowledge of selenium pollution impairs his enjoyment of living near the stream. *Id.* ¶ 11. Cindy Rank is a member of all three plaintiff organizations. Rank Dep. 7-8. Ms. Rank has visited the Dingess Run area several times since 1997 to observe the stream and wildlife. Rank Decl. ¶ 11. She is distressed by selenium pollution in the area. *Id.* ¶ 12. She plans to return to Dingess Run, likely once a year in the future. *Id.* ¶ 16. These allegations are sufficient to confer standing on Plaintiffs as to Outfalls 001 and 002.

   *2. Sixty Days' Notice*

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the State in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A). Plaintiffs sent a letter to the appropriate recipients which provided the necessary details for valid notice of suit on April 23, 2012, *see* ECF No. 91-34, and this lawsuit commenced over sixty days later, on July 16, 2012. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.

### 3. Good-Faith Allegation in Complaint of Continuous or Intermittent Violation

As explained above, Plaintiffs bring their claims under the citizen suit provisions of the CWA and the SMCRA. The CWA's citizen suit provision states,

> [A]ny citizen may commence a civil action on his own behalf . . . (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

33 U.S.C. § 1365(a). Under the SMCRA's citizen suit provision,

> [A]ny person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter . . . against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter . . . .

30 U.S.C. § 1270(a). The Supreme Court has interpreted the phrase "alleged to be in violation"—which appears in both the CWA and the SMCRA provisions above—to require "that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable

23

likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987) ("*Gwaltney II*").[13]

"[A] good-faith allegation [of continuous or intermittent violation] . . . suffice[s] for jurisdictional purposes . . . ." *Id.* at 65. The issue of what evidence must be shown for jurisdictional purposes is distinct from what evidence must be shown for a defendant to ultimately be held liable for violations of the CWA and the SMCRA. *See Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171 (4th Cir. 1988) ("*Gwaltney III*") (on remand from the Supreme Court, drawing a distinction between "a good faith allegation of ongoing violation sufficient to maintain jurisdiction" and "prov[ing] [an] allegation of continuous or intermittent violations, as required in order to prevail"). The Supreme Court specifically rejected the proposition that "citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches." *Gwaltney II*, 484 U.S. at 64. Good-faith allegations, not definitive proof, suffice for jurisdictional purposes. *Id.* at 65. To meet the jurisdictional requirements, Plaintiffs must show that at the time they filed suit, they had a good-faith belief that each Defendant was in continuous or intermittent violation of the CWA and the SMCRA. In a jurisdictional sense, then, this good-faith belief is an element of each of Plaintiffs' claims.

---

[13] The *Gwaltney* line of cases is highly instructive for the Court's deliberations here. For the purposes of this case, it is useful for the Court to refer to several of the cases in this line: 1) the district court's original decision, 611 F. Supp. 1542 (E.D. Va. 1985) ("*Gwaltney I*"); 2) the Supreme Court's decision on appeal from the Fourth Circuit Court of Appeals, 484 U.S. 49 (1987) ("*Gwaltney II*"); and 3) the Fourth Circuit's decision on remand from the Supreme Court, 844 F.2d 170 (4th Cir. 1988) ("*Gwaltney III*").

Accordingly, the Court must consider what constitutes a sufficient good-faith belief for jurisdictional purposes. In the district court case which eventually gave rise to the Supreme Court's *Gwaltney II* decision, the Eastern District of Virginia considered this question:

> A useful analogy [for understanding good-faith belief] is the manner in which the federal courts treat the jurisdictional amount requirement in diversity cases. . . .
>
> In diversity cases, the question whether the jurisdictional amount is satisfied—and whether the court, ultimately, has jurisdiction—is not answered by whether the plaintiff ultimately recovers in excess of $10,000. Rather, the issue is whether the amount plaintiff *stated in the original claim* satisfies the amount, and is made in good faith. . . . [T]he test of good faith is whether it appears to be a "legal certainty" that the jurisdictional fact is not satisfied.

*Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.*, 611 F. Supp. 1542, 1549 n.8 (E.D. Va. 1985) (emphasis in original) (citations omitted) ("*Gwaltney I*"), *aff'd*, 791 F.2d 304 (4th Cir. 1986), *vacated on different grounds sub nom., Gwaltney II,* 484 U.S. 49 (1987). In *Gwantley I,* the district court found that "there was no certainty . . . —legal, factual, or otherwise—that [the defendant's] system would correct one of the two major violation problems for which this suit was brought—until nearly one year after the suit was filed." *Id.* at 1549 n.8. Therefore, the plaintiffs in that case had sufficiently pled a violation in good faith.

Plaintiff's Complaint includes Appendix B, which is a table of violations of Aracoma's WV/NPDES Permit WV1010689. App. B, ECF No. 1-1 at 3. For Outfall 001, the most recent alleged violation prior to the filing of the Complaint is a measurement of 23.4 ug/l on May 12, 2010, which would be a violation of the acute standard. For Outfall 002, the most recent measurement provided from prior to the filing of the Complaint is a measurement of 16.6 ug/l on May 12, 2010. There was also a measurement of 33.7 ug/l at that Outfall on October 6, 2009. The measurements of 23.4 ug/l and 33.7 ug/l would constitute violations of the acute standard.

25

Plaintiffs also allege an "absence of any evidence that Aracoma has made any efforts to prevent future similar selenium-laden discharges from the Outfalls identified above." Compl. ¶ 83. Although there is a significant lapse in time from the evidence of last violation to the filing of the Complaint for Outfalls 001 and 002, in the face of this evidence it is not a legal certainty that Aracoma had corrected its alleged problems at Outfalls 001 or 002. Therefore, Plaintiffs' Complaint sufficiently pleads, in good faith, an ongoing or continuous violation at Outfalls 001 and 002.

### 4. Evidence Establishing Liability

Lastly, the Court considers whether Aracoma is actually liable for a violation of water quality standards. CWA liability can be established in two ways:

> Citizen-plaintiffs may [prove an ongoing violation] either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Gwaltney III,* 844 F.2d at 171-72; *see also Fola*, 2013 WL 6709957, at *24-25. Plaintiffs are not required to establish pre-Complaint violations in order to prevail, and neither are Plaintiffs required to prove the pre-Complaint violations alleged as a basis for jurisdiction in the Complaint. *Id.*

Plaintiffs present post-Complaint evidence sufficient to show at least one violation of water quality standards at each of Outfalls 001 and 002. For Outfalls 001 and 002, Plaintiffs present post-Complaint measurements from an inspection under Federal Rule of Civil Procedure 34, during which measurements were taken daily from July 29, 2013, to August 3, 2013. These measurements establish at least one chronic violation and one acute violation for Outfall 001.

ECF No. 91-17 (showing a chronic measurement as high as 22 ug/l and an acute measurement as high as 24 ug/l). They establish the same for Outfall 002. *Id.* (showing a chronic measurement as high as 19 ug/l and an acute measurement as high as 21 ug/l). Aracoma does not contest the evidence presented regarding these outfalls. The Court finds that Aracoma is liable for at least one violation of water quality standards at each of Outfalls 001 and 002. The Court accordingly **GRANTS in part** Plaintiffs' motion for partial summary judgment, ECF No. 91, specifically **GRANTING** the motion as to liability regarding Outfalls 001 and 002.

### B. *Bandmill's WV/NPDES Permit WV1015559*

Bandmill's discharges in the area of the Tower Mountain Surface Mine involve a unique situation compared to the other Defendants in this case. Namely, Plaintiffs argue that Bandmill's discharges are not covered by any permit and also argue, in the alternative, that even if Bandmill's discharges are covered by its permit, those discharges violate the permit terms. Plaintiffs came to present these two alternative arguments through an unusual timeline of events, as explained below.

Bandmill holds WV/NPDES Permit WV1015559, which covers activities at the Tower Mountain Surface Mine and authorizes discharges from Outfall 001 into Burgess Branch of the Guyandotte River. Plaintiffs allege in their Complaint, filed on July 16, 2012, that Bandmill's discharges from Outfall 001 violate water quality standards. On October 24, 2012, a few months after the Complaint was filed, the WVDEP re-issued Bandmill's permit. On November 19, 2012, OVEC and Sierra Club filed a Notice of Appeal with the West Virginia Environmental Quality Board ("EQB"), seeking to modify the re-issued permit to "include enforceable selenium limits which will ensure compliance with all applicable water quality standards." Notice Appeal at 1,

27

ECF No. 89-3. At the time of appeal, neither party realized that the same permit was simultaneously the subject of the EQB appeal and this lawsuit.

In the course of discovery for the instant case, counsel for Bandmill stated that the sediment control pond for Outfall 001 had been fully reclaimed and removed. Based on this revelation, Plaintiffs commenced a separate lawsuit against Bandmill on April 2, 2013, arguing—based on the same discharges that formed the basis of the original Complaint—that because the sediment pond had been fully reclaimed, those discharges were made without a permit. *OVEC v. Bandmill Coal Corp.*, No. 2:13-cv-6870 (S.D. W. Va.). That newer case was consolidated with the instant case on May 22, 2013. *OVEC v. Alex Energy, Inc.*, No. 3:12-cv-3412, ECF No. 52 (S.D. W. Va.). In October 2013, the parties reached an agreement regarding the EQB appeal. The Agreed Final Order encompassing their agreement for modification of Bandmill's permit imposed immediate monitoring and reporting requirements for selenium and selenium limits that would go into effect on February 1, 2016. Agreed Final Order, ECF No. 89-5.

Bandmill has moved for partial summary judgment, arguing that it has not made unpermitted discharges and that its modified permit moots Plaintiffs' claims for injunctive and declaratory relief. Bandmill's Mot. Summ. J., ECF No. 89; Bandmill's Mem. Supp. Mot. Summ. J., ECF No. 90. Plaintiffs have moved for partial summary judgment against Bandmill, arguing that Bandmill's discharges are not covered by any permit, and that, even if they are covered by a permit, they violate water quality standards. Pls.' Mot. Summ. J. Against Bandmill, ECF No. 85; Pls.' Mem. Supp. Mot. Summ. J. Against Bandmill, ECF No. 98. The Court will first decide if Bandmill has been making unpermitted discharges. If this question is answered in the negative,

then the Court will address whether Bandmill's discharges—although covered by the permit—nonetheless violate the permit's terms.

####    1.   *Alleged Unpermitted Discharges by Bandmill*

It is undisputed that the sediment pond associated with Outfall 001 has been reclaimed and removed. There was confusion among the parties, however, concerning whether Outfall 001 had been deleted from Bandmill's permit as a result of the Outfall's reclamation and removal. It is now clear that Outfall 001 is still part of this permit. In fact, although Bandmill petitioned to delete Outfall 001 from the permit, the WVDEP refused to remove Outfall 001 from the permit because the Agreed Final Order from the EQB imposed reporting requirements and future selenium limits. Email from WVDEP (Nov. 4, 2013), ECF No. 89-7. Bandmill argues that, in light of this refusal, its discharges from Outfall 001 are made pursuant to a valid permit.

Plaintiffs counter that Bandmill's selenium-laden discharges are not actually emanating from Outfall 001, but rather from Valley Fills 1R and 1L, allegedly located a "substantial distance" from where Outfall 001 used to be. *See* ECF No. 111-4 (map showing valley fills and Outfall 001). They argue that Bandmill is only permitted to discharge into Burgess Branch at the former location of Outfall 001, which is half a mile downstream of the valley fill discharges. Plaintiffs further argue that once Outfall 001 was removed, its authorization under Section A of the permit stopped. In support of their arguments, Plaintiffs also point out that DMRs filed by Bandmill since Outfall 001's reclamation list "no flow" for that outfall. ECF No. 111-6.

In resolving this dispute, the Court first notes that Bandmill is not bound by earlier statements regarding Outfall 001 that turned out to be mistaken. It is clear that the parties were confused by Outfall 001's reclamation, removal, and possible deletion from the permit, and those

earlier misstatements were excusable and caused no harm. Therefore, Bandmill is not bound by those statements.

Furthermore, the Court finds that the discharges from this area are *not* unpermitted. In other words, the discharges *are* covered by the permit. The Court recognizes that this situation is a bit of an anomaly, but it has given significant weight to the WVDEP's refusal to remove Outfall 001 from the permit. The Court therefore **GRANTS in part** Bandmill's motion for partial summary judgment and **DENIES in part** Plaintiffs' motion for partial summary judgment as to the issue of whether the discharges near Outfall 001 are covered by the permit.

2. *Discharges by Bandmill Alleged to be in Violation of Permit's Terms*

Having decided that Bandmill's discharges are covered by the existing permit, the Court now determines if those covered discharges violate the permit's terms. Plaintiffs argue that the modified terms of Bandmill's permit, based on the Agreed Final Order, do not excuse Bandmill from complying with the water quality standards before the stricter limits go into effect. Bandmill argues that the water quality standards language—a boilerplate provision—does not apply in light of the more specific future selenium limitations, placed more prominently in the permit after negotiation. As explained above, the WVDEP has the authority to temporarily suspend the requirement that a permit holder comply with water quality standards, and the WVDEP has done so with this permit. Therefore, Bandmill is not required to comply with the 5 ug/l chronic selenium limit and 20 ug/l acute selenium limit set by West Virginia's water quality standards in the interim period between issuance of Bandmill's modified permit and the effective date of the future selenium limits. Because of this, Bandmill is not liable for selenium discharges made after October 11, 2013—when the Agreed Final Order was entered—but before the

effluent limits go into effect on February 1, 2016. The Court must consider, however, if Bandmill violated the water quality standards after the Complaint was filed on July 16, 2012, but before the Agreed Final Order was entered on October 11, 2013.

### 3. Legal Standing

Plaintiffs allege legal standing through Cindy Rank and Vivian Stockman. Cindy Rank Decl., ECF No. 85-10; Vivian Stockman Decl., ECF No. 85-11; Cindy Rank Dep., ECF No. 85-12; Vivian Stockman Dep., ECF No. 85-13. The Tower Mountain Surface Mine discharges into Burgess Branch of Right Hand Fork of Rum Creek of the Guyandotte River. Ms. Rank is a member of all three plaintiff organizations. Rank Dep. 7-8. She visits the Rum Creek watershed at least once a year, during which visits she enjoys "the less impacted stream stretches," climbs into the stream, and observes wildlife. Rank Decl. ¶ 19. Ms. Rank is troubled by selenium discharges in the area and plans to return to the Rum Creek watershed "probably at least once a year." *Id.* ¶¶ 19, 20. Ms. Stockman is also a member of all three plaintiff organizations. Stockman Dep. 6-7. She has visited the Rum Creek area approximately ten times and will visit at least three times in the next two years. Stockman Decl. ¶ 31. During these visits, Ms. Stockman attempts to enjoy the stream, but her enjoyment is diminished because of selenium pollution in the area. *Id.* ¶ 32. Bandmill does not argue that these allegations are insufficient to support standing. Standing is satisfied here.

### 4. Sixty Days' Notice

Plaintiffs sent a letter to the appropriate recipients which provided the necessary details for valid notice of the original lawsuit on April 23, 2012, *see* ECF No. 85-14, and this lawsuit

was commenced over sixty days later. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.[14]

     *5.  Good-Faith Allegation in Complaint of Continuous or Intermittent Violation*

     The only pre-Complaint evidence of a violation is a single sampling from June 15, 2011, by the WVDEP's Watershed Assessment Branch, which measured a selenium concentration of 27.6 ug/l in Burgess Branch. Compl. ¶ 89. That measurement violates the acute selenium limit of 20 ug/l set by the water quality standards. Plaintiffs also point to the "absence of any evidence that Bandmill has made any efforts to prevent future similar selenium-laden discharges." *Id.* ¶ 92. Plaintiffs' Complaint sufficiently pleads, in good faith, a continuous or intermittent violation at Outfall 001.

     *6.  Evidence Establishing Liability*

     Again, for the reasons explained above, Bandmill can only be held liable for violations of the water quality standards which were committed after the Complaint was filed on July 16, 2012, but before the Agreed Final Order was entered on October 11, 2013. Plaintiffs present evidence from their Rule 34 inspection which shows multiple violations of the chronic and acute limits based on daily sampling from July 8 to July 13, 2013. ECF No. 85-9. For example, Downstream Strategies measured a selenium concentration of 26 ug/l on July 13, 2013, at Valley Fill 1L and a four-day average of 23.25 ug/l at that same location. *Id.* Bandmill does not dispute the accuracy of this sampling. Plaintiffs have established at least one selenium violation at Outfall 001.

---

[14] Because the Court finds that Bandmill's discharges are covered by its permit—contrary to Plaintiffs' allegations in their later complaint consolidated with the instant action—, the Court need not address the issue of notice regarding Plaintiffs' later complaint.

*7.  Bandmill's Motion for Partial Summary Judgment*

Bandmill has moved for partial summary judgment, arguing that it has not made unpermitted discharges and that its modified permit moots Plaintiffs' claims for injunctive and declaratory relief. The Court has already found that Bandmill's discharges were covered by its existing permit. Additionally, it is premature to rule at this time that Plaintiffs' claims for injunctive and declaratory relief are mooted. Phase II addresses such relief. The Court therefore **DENIES** Bandmill's motion to the extent it argues that Plaintiffs' claims for declaratory and injunctive relief are moot.

In summary, the Court **FINDS** that Bandmill's discharges are covered by its WV/NPDES Permit WV1015559 but also **FINDS** that Bandmill is liable for selenium violations at Outfall 001 of that permit. In accordance with these findings, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion for partial summary judgment against Bandmill. Specifically, the Court **GRANTS** the motion as to liability regarding Outfall 001 of this permit. The Court **DENIES** Plaintiffs' motion to the extent it asks this Court to find that Bandmill's discharges were made without a permit. The Court also **GRANTS in part** and **DENIES in part** Bandmill's motion for partial summary judgment.

### C.  Highland's WV/NPDES Permit WV1016938

Highland's WV/NPDES Permit WV1016938 incorporates by reference West Virginia Code of State Rules § 47-30-5.1.f, requiring that discharges shall not violate applicable water quality standards. The Complaint alleges selenium violations at three outfalls covered by this permit: Outfalls 001, 019, and 020. Outfalls 001 and 020 discharge into one or more unnamed tributaries of Freeze Fork of Dingess Run of the Guyandotte River. Outfall 019 discharges into

Freeze Fork. Plaintiffs move for partial summary judgment regarding Highland's liability for violations at Outfalls 001 and 019. ECF Nos. 91, 100. Highland moves for summary judgment on the grounds that its re-issued permit moots Plaintiffs' claims for declaratory and injunctive relief regarding Outfalls 001, 019, and 020. Highland's Mot. Summ J., ECF No. 93; Highland's Mem. Supp. Mot. Summ. J., ECF No. 94. The Court will address Plaintiffs' motion before turning to Highland's.

As explained earlier, under the terms of Highland's modified permit, the WVDEP has temporarily suspended the requirement that Highland comply with water quality standards and has imposed effluent limitations on selenium that go into effect in 2015. The Court therefore holds that Highland cannot be liable for selenium violations which occurred after the permit was re-issued in December 2012. However, Highland can be held liable for water quality standard violations which occurred between the filing of the Complaint on July 16, 2012, and the re-issuance of its permit on December 6, 2012.

### 1. *Legal Standing*

Plaintiffs allege standing through Kenneth King and Cindy Rank, the same declarants used to establish liability for the Aracoma permit. Mr. King is a member of OVEC and Sierra Club, but not the West Virginia Highlands Conservancy, King Dep. 9-10, ECF No. 91-28, while Ms. Rank is a member of all three plaintiff organizations, Rank Dep. 7-8, ECF No. 91-29. Mr. King states that he visited Freeze Fork fifteen to twenty times, until about ten years ago, during which visits he would hike, pick plants, and look for artifacts. King Decl. ¶ 8, ECF No. 91-22. Mr. King states that he would return to Freeze Fork and the unnamed tributary of Dingess Run if permitted to do so and that he is concerned about selenium pollution in the area. *Id.* ¶ 10. Ms.

34

Rank has visited the Dingess Run area multiple times to enjoy the stream, but she is concerned about the effects of selenium pollution in Freeze Fork and Dingess Run. Rank Decl. ¶¶ 11, 12, 14, ECF No. 91-23. Ms. Rank plans to visit Dingess Run again, probably at least once a year. *Id.* ¶ 16. Defendants do not allege that the elements of standing are not met. The Court finds that standing is met here.

### 2. *Sixty Days' Notice*

Plaintiffs sent a letter to the appropriate recipients which provided the necessary details for valid notice of suit on April 23, 2012, *see* ECF No. 91-34, and this lawsuit was commenced over sixty days later.. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.

### 3. *Good-Faith Allegation in Complaint of Continuous or Intermittent Violation*

Plaintiffs' Complaint includes Appendix C, which is a table of measurements from various outfalls associated with this permit. App. C, ECF No. 1-1 at 4-13. For Outfall 001, the most recent alleged violation of the acute limit prior to the filing of the Complaint is in July 2011. *Id.* at 7 (showing a measurement of 20.1 ug/l and other violations in preceding months). For Outfall 019, the most recent alleged violation of the acute limit prior to the filing of the Complaint is in April 2011. *Id.* at 11 (showing a measurement of 30.8 ug/l). For both of these outfalls, March 2012 "average" measurements are reported which exceed 5 ug/l.  *Id.* at 8 (showing "average" of 5.45 ug/l at Outfall 001 in March 2012); *Id.* at 11 (showing "average" of 6.76 ug/l at Outfall 019 in March 2012). However, it is not clear whether these constitute violations of the chronic limit.[15] Plaintiffs also allege the "absence of any evidence of any

---

[15] As explained above, a chronic measurement is a four-day average concentration. However, the

meaningful efforts by Highland to eradicate the cause of the violations." Compl. ¶ 102. Based on this evidence, the Court finds that Plaintiffs have sufficiently pled, in good faith, violations of the water quality standards at Outfalls 001 and 019.

    *4.  Evidence Establishing Liability*

    Lastly, the Court determines whether any violations by Highland have been proven between July 16, 2012 and December 6, 2012. Plaintiffs' arguments regarding post-Complaint violations at Outfalls 001 and 019 focus on the results of the Rule 34 citizen inspection. However, that inspection occurred in July and August 2013, well after Highland's permit was re-issued in December 2012. Measurements from the citizen inspection, therefore, cannot be used to prove post-Complaint violations for the discrete timeframe of July 16, 2012 to December 6, 2012.

    The only evidence in the record of measurements from Outfalls 001 and 019 during that timeframe comes from Highland's DMRs. ECF No. 91-9 at 1-5. According to that information, the majority of measurements for Outfall 001 from July 2012 to December 2012 were below 2 ug/l. *Id.* at 3. The highest measurement for Outfall 001—in December 2012—was 2.68 ug/l, well below both the acute limit of 20 ug/l and the chronic limit of 5 ug/l (if the measurement could even be considered chronic). *Id.* The highest reading for Outfall 019 during that timeframe was 2.85 ug/l, also well below the selenium limits set by the water quality standards. *Id.* at 5.[16] Therefore, the evidence does not establish violations at Outfalls 001 and 019.

---

"average" values reported in Appendix C appear to be an average of the minimum and maximum values for that month, not necessarily reflecting an average across four days.

[16]  A second table of data containing measurements from these outfalls, ECF No. 91-10, does not include any data from July to December 2012.

Plaintiffs can alternatively establish CWA violations "by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Gwaltney III,* 844 F.2d at 171-72. However, the Court will not find Highland liable on this basis. It would be premature to rule at this point that Highland—which now acts under the terms of a compliance schedule—is likely to violate applicable selenium limits in the future. The Court therefore **DENIES** Plaintiffs' motion for partial summary judgment regarding liability at these two outfalls.

     *5.  Highland's Motion for Partial Summary Judgment*

Highland argues that the modification of its permit moots Plaintiffs' claims for declaratory and injunctive relief. Plaintiffs respond that their claims are not mooted because 1) Highland cannot show with certainty that there will be no more selenium violations in the future and 2) there is a "realistic prospect of future noncompliance." Pls.' Resp. Highland's Mot. Summ. J. at 10, ECF No. 102. Plaintiffs also argue that the compliance schedule does not moot this citizen suit. The Court **DENIES** Highland's motion for summary judgment at this time because it is premature to rule that declaratory and/or injunctive relief is unwarranted. Therefore, the Court also **DENIES as moot** Plaintiffs' Rule 37(c) motion to strike Exhibit 1 of Highland's reply brief in support of its motion for partial summary judgment.

In summary, Plaintiffs' motion for partial summary judgment, ECF No. 91, is **DENIED** regarding Outfalls 001 and 019 of Highland's WV/NPDES Permit WV1016938. The Court also **DENIES** Highland's motion for partial summary judgment, ECF No. 93.

    **D.  *Independence's WV/NPDES Permit 1016890***

Independence's WV/NPDES Permit 1016890 requires Independence to monitor and

report selenium concentrations. It also incorporates by reference the water quality standards provision. As explained above, the WVDEP is not permitted to indefinitely suspend the requirement that permit holders comply with water quality standards. Independence's discharges under this permit must therefore comply with the selenium limits set by the water quality standards, namely, the chronic limit of 5 ug/l and the acute limit of 20 ug/l. The Complaint alleges violations of the selenium limits at Outfall 004 of this permit, which discharges into Chimney Branch of Matts Creek of West Fork of the Coal River. Plaintiffs move for partial summary judgment regarding Outfall 004. ECF Nos. 91, 100.

### 1. Legal Standing

Plaintiffs allege standing through Charles "Chuck" Nelson, Maria Gunnoe, and Vivian Stockman. *See* Charles Nelson Decl., ECF No. 91-24; Maria Gunnoe Decl., ECF No. 91-25; Vivian Stockman Decl., ECF No. 91-26; Charles Nelson Dep., ECF No. 91-30; Maria Gunnoe Dep., ECF No. 91-31; Vivian Stockman Dep., ECF No. 91-32. Chuck Nelson is a member of OVEC. Nelson Decl. ¶ 2. He used to work in Matts Creek and has visited the creek hundreds of times. *Id.* ¶ 12. Mr. Nelson returned to the creek at least eight times since 2010, but he no longer fishes in Matts Creek, in part because of selenium pollution. *Id.* ¶ 15. During these visits, he is concerned about such pollution. *Id.* ¶¶ 13, 15. He also visits West Fork monthly. *Id.* ¶ 17. He states that he will return to these areas in the future. *Id.* ¶ 19. Maria Gunnoe is a member of OVEC and Sierra Club. Gunnoe Dep. 7. She has visited the West Fork and Matts Creek area since she was a child. Gunnoe Decl. ¶¶ 10, 14, 15, 16. Currently, Ms. Gunnoe frequently travels to Matts Creek to observe the stream and enjoy nature, but she finds selenium pollution there and in West Fork to be "upsetting." *Id.* ¶¶ 11, 17. Vivian Stockman is a member of all three plaintiff

38

organizations. Stockman Dep. 6-7. She states that she has visited the area of West Fork and Matts Creek at least three times a year over the past four years and that she will visit again at least three times over the next two years, with more visits later. Stockman Decl. ¶¶ 13, 15. Ms. Stockman walks around this area and observes the streams, but is concerned about the effects of selenium, which diminishes her enjoyment of this area. *Id.* ¶¶ 14, 15. Independence does not contest standing. Standing is satisfied through these claimants.

       *2.   Sixty Days' Notice*

Plaintiffs sent a letter to the appropriate recipients which provided the necessary details for valid notice of suit on April 23, 2012, *see* ECF No. 91-34, and this lawsuit was commenced over sixty days later. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.

       *3.   Good-Faith Allegation in Complaint of Continuous or Intermittent Violation*

Appendix D to the Complaint lists selenium measurements from Outfall 004. App. D, ECF No. 1-1 at 14. Prior to the filing of the Complaint, the most recent alleged selenium violation occurred in March 2012, just a few months before the Complaint was filed, with a measured value of 65.46 ug/l as the daily maximum. *Id.* Violations are shown for previous months as well. *Id.* The Complaint also alleges "the absence of any evidence of any meaningful efforts by Independence to eradicate the cause of the violations." Compl. ¶ 111. The Court finds that Plaintiffs have sufficiently pled, in good faith, a violation in the Complaint.

       *4.   Evidence Establishing Liability*

To establish liability, Plaintiffs point to information from Independence's DMRs, which reveals selenium measurements from July 2012 to June 2013 that exceed the water quality

39

standards' acute selenium limit of 20 ug/l. ECF No. 91-11 at 7-13 (revealing selenium measurements for Outfall 004 in that timespan which all exceed 20 ug/l and go as high as 76.19 ug/l). Independence does not dispute these measurements. Therefore, Plaintiffs have proven at least one violation by Independence, and summary judgment is **GRANTED** in favor of Plaintiffs regarding Independence's liability.

### E. Jacks Branch's WV/NPDES Permit WV0093929

Jacks Branch's WV/NPDES Permit WV0093929 sets, on its face, selenium effluent limits of 4.7 ug/l as a monthly average and 8.2 ug/l as a daily maximum. The Complaint alleges violations of these selenium limits at Outfalls 004, 014, and 015. Outfall 004 discharges into the Kanawha River, while Outfalls 014 and 015 discharge into Dunn Hollow of the Kanawha River. Plaintiffs move for judgment in their favor as to Jacks Branch's liability regarding all three outfalls. Pls.' Mot. Summ. J. Against Jacks Branch, ECF No. 83; Pls.' Mem. Supp. Mot. Summ. J. Against Jacks Branch, ECF No. 84.

#### 1. Legal Standing

Plaintiffs allege standing through Cindy Rank and Vivian Stockman. *See* Cindy Rank Decl., ECF No. 83-9; Vivian Stockman Decl., ECF No. 83-10; Cindy Rank Dep., ECF No. 83-11; Vivian Stockman Dep., ECF No. 83-12. Ms. Rank and Ms. Stockman are both members of all three plaintiff organizations. Rank Dep. 7-8; Stockman Dep. 6-7. Ms. Rank, who visits the Dunn Hollow and Kanawha River area, states that her enjoyment of the area would be greater if there were no selenium pollution there and that she will return to the Dunn Hollow area at least yearly. Rank Decl. ¶¶ 36, 37. She believes that "[t]he Kanawha River deserves better." *Id.* ¶ 36. Ms. Stockman also visits Dunn Hollow to enjoy the area, is concerned about the effects of

selenium pollution on Dunn Hollow and the Kanawha River, and will continue to visit Dunn Hollow in the foreseeable future. Stockman Decl. ¶ 28; Stockman Dep. 28-30. Defendants do not contest Plaintiffs' assertion of standing. The Court finds that Plaintiffs have established standing.

### 2.  Sixty Days' Notice

Plaintiffs sent a letter to the appropriate recipients which included the necessary details to provide valid notice of suit on April 23, 2012, *see* ECF No. 83-13, and this lawsuit was commenced over sixty days later.. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.

### 3.  Good-Faith Allegation in Complaint of Continuous or Intermittent Violation

In their Complaint, Plaintiffs allege selenium violations at Outfalls 004,[17] 014, and 015, and a table of violations is attached to the Complaint as Appendix E. App. E, ECF No. 1-1 at 15-17. For Outfall 004, the most recent alleged violation of the daily maximum limit prior to the filing of the Complaint was a daily maximum measurement of 8.66 ug/l in December 2011, and the most recent alleged violation of the monthly average was a monthly average of 4.94 ug/l in January 2012. *Id.* at 15. For Outfall 014, the most recent alleged violation of the daily maximum limit was a measurement of 9.03 ug/l in December 2011, and the most recent alleged violation of the monthly average was a measurement of 5.19 ug/l in March 2012. *Id.* For Outfall 015, the most recent alleged violations of the daily maximum and monthly average limits were from March 2012. *Id.* at 17 (revealing a monthly average of 8.79 ug/l and a daily maximum of 9.82 ug/l). Plaintiffs also allege an "absence of any evidence of any meaningful efforts by Jacks Branch to eradicate the cause of the violations." Compl. ¶ 118. Defendants do not contest this

---

[17] The Complaint sometimes refers to Outlet 001 instead of 004, but the Court treats such references as typos.

evidence. Plaintiffs sufficiently allege, in good faith, continuous or intermittent violations of this permit.

### 4.  Evidence Establishing Liability

Plaintiffs present post-Complaint evidence sufficient to show at least one violation of the selenium limits in this permit at each outfall. For example, for Outfall 004, a DMR from December 2012 shows a daily maximum of 15.4 ug/l and a monthly average of 8.33 ug/l. ECF No. 83-2 at 12. For Outfall 014, a DMR from December 2012 shows a daily maximum of 16.7 ug/l and a monthly average of 16.7 ug/l. *Id.* at 49. For Outfall 015, a DMR from December 2012 shows a daily maximum of 21.1 ug/l and a monthly average of 20.6 ug/l. *Id.* at 42. Violations for all three outfalls are also shown in 2013. *Id.* at 50. Jacks Branch does not contest the evidence presented. Therefore, the Court finds that Jacks Branch is liable for at least one violation of the selenium limits found in this permit for each of Outfalls 004, 014, and 015. The Court accordingly **GRANTS** partial summary judgment in favor of Plaintiffs as to Jacks Branch's liability for each of these outfalls.

### 5.  Jacks Branch's Request to Delay Ruling and Motion for a Partial Stay

Jacks Branch does not contest Plaintiffs' standing or the evidence of permit violations presented. Rather, Jacks Branch argues that the Court should delay ruling on Plaintiffs' motion for partial summary judgment against Jacks Branch in order to allow more time for settlement negotiations between Jacks Branch and the EPA, which could moot Plaintiffs' claims against Jacks Branch. Jacks Branch also argues that Plaintiffs are not entitled to a permanent injunction. The Court agrees that an injunction at this point would be premature. Instead, phase II of this litigation will address relief. As to Jacks Branch's mootness argument, however, the Court notes

that citizen suits are contemplated in the CWA as a separate avenue for ensuring environmental compliance, entirely distinct from EPA enforcement actions.

Since the time that briefings on the motions for partial summary judgment were filed, Jacks Branch filed a motion for a partial stay of these proceedings pending entry of a consent decree between Jacks Branch and the EPA. ECF No. 133. The proposed consent decree was filed in the separate case of *United States v. Alpha Natural Resources, Inc.*, No. 2:14-cv-11609 (S.D. W. Va. Mar. 5, 2014). Although it is possible that the consent decree could moot Plaintiffs' claims against Jacks Branch, it is unclear when the consent decree will be approved. Additionally, the Court is prepared to rule as to liability. Relief will be left to later stages, and the effect of the consent decree—if approved—will be assessed at that time. Therefore, the Court rejects Jacks Branch's mootness argument at this time but **holds in ABEYANCE** Jacks Branch's motion for a partial stay.

### F.  *Jacks Branch's WV/NPDES Permit WV1012452*

Jacks Branch's WV/NPDES Permit WV1012452 sets, on its face, selenium effluent limits of 4.7 ug/l as a monthly average and 8.2 ug/l as a daily maximum. The Complaint alleges violations at seven outfalls: Outfalls 001, 002, 009, 011, 012, 014, and 015. Plaintiffs are no longer pursuing their claims regarding Outfall 001, pursuant to the Stipulation filed in this matter. Stipulation, ECF No. 33. Outfalls 002, 009, and 011 discharge into Hughes Creek of the Kanawha River. Outfall 014 discharges into Hurricane Fork of Kelly's Creek of the Kanawha River. Outfall 015 discharges into Bells Creek of Twentymile Creek of the Gauley River. Plaintiffs move to partial summary judgment as to Jacks Branch's liability regarding Outfalls 002, 009, 011 and 014. ECF Nos. 83, 84. Jacks Branch moves for partial summary judgment

regarding Outfall 15. Jacks Branch's Mot. Summ. J., ECF No. 95; Jacks Branch's Mem. Supp.

Mot. Summ. J., ECF No. 96. The Court will discuss Plaintiffs' motion for partial summary

judgment before turning to Jacks Branch's motion.

### 1. Legal Standing

As with the Jacks Branch permit discussed above, Plaintiffs allege standing to challenge

this permit through Cindy Rank and Vivian Stockman, who are both members of all three

plaintiff organizations. Rank Dep. 7-8; Stockman Dep. 6-7. Ms. Rank drives along Kelly's

Creek, making stops during the drive, but her enjoyment is diminished by her knowledge of

selenium pollution. Rank Decl. ¶ 26. She expects to return "possibly once a year." *Id.* ¶ 27. Ms.

Rank has also traveled to Hughes Creek to watch wildlife and enjoy the stream, and will likely

return yearly. *Id.* ¶¶ 28, 29. Ms. Stockman states that she is very concerned by selenium pollution

from the mining and that her enjoyment of downstream areas is diminished as a result. Stockman

Decl. ¶ 17. Ms. Stockman enjoys her visits to Hughes Creek, but she is upset by selenium

pollution in the creek. *Id.* ¶¶ 18-20. Regardless, she plans to return to the area at least three times

in the next two years, and after that as well. *Id.* ¶ 18. Ms. Stockman frequently visits Kelly's

Creek to enjoy the stream and wildlife, is bothered by the selenium pollution there, and will visit

the area at least three times in the next two years, and after that as well. *Id.* ¶ 25. Jacks Branch

does not contest standing. The Court finds that standing is satisfied here.

### 2. Sixty Days' Notice

Plaintiffs sent a letter to the appropriate recipients which provided the necessary details

for valid notice of suit on April 23, 2012, *see* ECF No. 83-13, and this lawsuit was commenced

over sixty days later. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.

### 3. *Good-Faith Allegation in Complaint of Continuous or Intermittent Violation*

Plaintiffs' Complaint includes Appendix G, which is a table of violations of this permit. App. G, ECF No. 1-1 at 19-23. For Outfall 002, the most recent alleged violations of the daily maximum limit and the monthly average limit prior to the filing of the Complaint occurred in November 2011. *Id.* at 19 (revealing daily maximum of 10.1 ug/l and monthly average of 9.34 ug/l). For Outfalls 009 and 011, the most recent alleged violations of these two limits prior to the filing of the Complaint occurred in March 2012. *Id.* at 21 (for Outfall 009, revealing daily maximum of 14.3 ug/l and monthly average of 13.5 ug/l), 22 (for Outfall 011, revealing daily maximum of 16.2 ug/l and monthly average of 15.8 ug/l). For Outfall 014, the most recent alleged violation of the monthly average limit prior to the filing of the Complaint occurred in July 2010, approximately two years before the Complaint was filed. Plaintiffs also allege an "absence of any evidence of any meaningful efforts by Jacks Branch to eradicate the cause of the violations." Compl. ¶ 140. Although there is a significant lapse in time between the evidence of the last violation for Outfall 014 and the filing of the Complaint, it does not appear to be a "legal certainty" that Jacks Branch had corrected its problems at Outfall 014 by the time the Complaint was filed. Therefore, Plaintiffs' Complaint sufficiently pleads, in good faith, violations at Outfalls 002, 009, 011, and 014.

### 4. *Evidence Establishing Liability*

Plaintiffs present post-Complaint evidence sufficient to show at least one violation of the selenium limits per outfall at Outfalls 002, 009, 011, and 014. For Outfall 002, DMRs show a

monthly average of 4.75 ug/l in December 2012—violating the monthly average limit—, as well as selenium limit violations in previous months. ECF No. 83-7 at 10-13. For Outfall 009, DMRs show excessive daily maximums and monthly averages in December 2012, as well as previous months. *Id.* at 40-44 (revealing a monthly average of 14.3 ug/l and a daily maximum of 16.3 ug/l in December 2012). For Outfall 011, the DMR from December 2012 reveals a daily maximum of 12.1 ug/l and a monthly average of 12.1 ug/l. *Id.* at 72. Other violations at Outfall 011 are shown in previous months. *Id.* at 68-71. For Outfall 014, Plaintiffs point to DMR information from July 2012, revealing a monthly average of 6.78 ug/l. *Id.* at 75. Although the Complaint was filed on July 16, 2012, this excessive monthly average measurement in July 2012 nonetheless suffices to establish a post-Complaint violation because "each violation of a monthly average limitation [is] equivalent to a daily violation for each day of that month." *Gwaltney*, 791 F.2d at 313. Jacks Branch does not contest the evidence presented regarding these outfalls. Therefore, the Court finds that Jacks Branch is liable for at least one violation of the selenium limits found in this permit at each of Outfalls 002, 009, 011, and 014. Summary judgment is **GRANTED** in favor of Plaintiffs as to Jacks Branch's liability regarding these outfalls.

*5. Jacks Branch's Motion for Partial Summary Judgment as to Outfall 015*

Jacks Branch has moved for summary judgment regarding Outfall 15 under this permit. Plaintiffs did not file a response to Jacks Branch's motion, and there is, accordingly, also no reply. According to Appendix G of the Complaint, the most recent alleged violation for Outfall 015 prior to the filing of the Complaint occurred in June 2010. ECF No. 1-1 at 23 (revealing a monthly average of 6.74 ug/l). Jacks Branch argues that it has been years since it has violated the permit's selenium limits for Outfall 015. Exhibit 1 to Jacks Branch's motion for partial summary

46

judgment presents DMRs from March 2010 to July 2012 for Outfall 015. ECF No. 95-1. While the DMRs from March 2010 to June 2010 indicate selenium violations, the DMRs reveal no selenium violations from July 2010 through July 2012, the month in which the Complaint was filed. Furthermore, DMRs from August 2012 to October 2013 for Outfall 015 also reveal no selenium violations. ECF No. 95-2. Plaintiffs present no evidence of post-Complaint violations at Outfall 015. In the face of this evidence, the Court will not find that there is a likelihood of future violations for this outfall. Therefore, the Court **GRANTS** partial summary judgment in favor of Jacks Branch regarding Outfall 015 under this permit.

   *6.   Jacks Branch's Request to Delay Ruling and Motion for a Partial Stay*

   As with Permit WV0093929, Jacks Branch argues here that the Court should delay ruling because of an impending consent decree and that a permanent injunction should not be granted. For the reasons explained above, the Court will not grant a permanent injunction as this time but also will not delay ruling on Jacks Branch's liability under this permit. Also for the reasons explained above, the Court **holds in ABEYANCE** Jacks Branch's motion for a partial stay.

**G. *Kanawha Energy's WV/NPDES Permit WV1015176***

   Kanawha Energy's WV/NPDES Permit WV1015176 incorporates by reference West Virginia Code of State Rules § 47-30-5.1.f, the requirement that discharges shall not violate applicable water quality standards. The Complaint alleges violations of selenium water quality standards at Outfall 007, which discharges into Fourmile Fork of Smithers Creek of the Kanawha River. Plaintiffs move for partial summary judgment on the issue of liability regarding Outfall 007. ECF Nos. 91, 100.

   *1.   Legal Standing*

Plaintiffs allege standing through Vivian Stockman and T. Paige Dalporto. *See* Vivian Stockman Decl., ECF No. 91-26; T. Paige Dalporto Decl., ECF No. 91-27; Vivian Stockman Dep., ECF No. 91-32; T. Paige Dalporto Dep., ECF No. 91-33. Ms. Stockman is a member of all three plaintiff organizations. Stockman Dep. 6-7. She has visited Smithers Creek several times, observing the stream and wildlife during her visits, but she is upset by selenium pollution in this area. Stockman Decl. ¶¶ 22-24. Ms. Stockman states that she will return to the area at least three times in the next two years, with additional visits later. *Id.* ¶ 22. Mr. Dalporto is a member of OVEC and has visited Smithers Creek since childhood. Dalporto Decl. 1-2. He still enjoys stops at the creek and plans to visit the area at least three times in the next two years, with additional visits thereafter. *Id.* Mr. Dalporto is concerned about selenium pollution in the stream. *Id.* Kanawha Energy does not contest standing. The Court finds that standing is met here.

### 2. Sixty Days' Notice

Plaintiffs sent a letter to the appropriate recipients which provided the necessary details for valid notice of suit on April 23, 2012, *see* ECF No. 91-34, and this lawsuit was commenced over sixty days later. Plaintiffs meet the sixty days' notice requirement, and Defendants do not argue otherwise.

### 3. Good-Faith Allegation in Complaint of Continuous or Intermittent Violation

Appendix H of the Complaint presents measurements from Outfall 007. App. H, ECF No. 1-1 at 24-25. According to these measurements, the most recent violation of the selenium limits prior to the filing of this Complaint occurred in March 2012, with a "maximum" value of 20.4 ug/l. *Id.* at 25. Other pre-Complaint violations in earlier months are presented as well. *Id.* Plaintiffs also allege "the absence of any evidence of any meaningful efforts by Kanawha Energy

to eradicate the cause of the violations." Compl. ¶ 149. Plaintiffs have sufficiently pled in the Complaint, in good faith, violations at Outfall 007.

    *4.  Evidence Establishing Liability*

Plaintiffs present post-Complaint evidence of violations at Outfall 007 by pointing to measurements from DMRs submitted by Kanawha Energy to the WVDEP. ECF No. 91-14. These measurements show violations of the acute limit in March and April 2013. *Id.* at 51 (showing maximums of 27.8 ug/l and 23.4 ug/l, respectively). Kanawha Energy does not dispute these measurements. Therefore, the Court **GRANTS** partial summary judgment in favor of Plaintiffs as to Kanawha Energy's liability regarding violations at this outfall.

## H.  Conclusion

For the reasons explained above, the Court makes the findings and rulings noted in this Memorandum Opinion and Order.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

                        ENTER: March 31, 2014

                        ROBERT C. CHAMBERS, CHIEF JUDGE